STATE EX REL. SHELDON, Receiver, and others, Respondents, vs. DAHL and another, Appellants.

FELTHOUSE, Appellant, vs. DAHL and another, Respondents.

*January 18—April 4, 1917.*

*Officers: Breach of duty: State treasurer: Premature surrender of securities deposited by trust company: Liability to creditors: Nominal damages.*

1. In the absence of proof that actual damages were naturally and proximately caused by the failure of a public officer to perform an official duty, only nominal damages are recoverable where a liability exists.

2. Where, prior to the recording, as required by sec. 1789, Stats., of the resolution dissolving a trust company which had deposited securities with the state treasurer pursuant to sec. 1791e, Stats. (ch. 504, Laws 1905), said treasurer surrendered the securities to the trust company, such surrender, even though made in good faith, was a breach of his official bond

and rendered him liable to the creditors of the trust company, if such premature delivery naturally and proximately caused them any actual damage.

3. It appearing in such case, among other things, that the securities were surrendered in good faith one day before the resolution of dissolution was recorded; that such surrender did not in fact prevent or prejudice the taking by the plaintiff creditors of any contemplated action to assert their rights to have the securities applied to the satisfaction of their demands; and that, even if the securities had not been prematurely surrendered, they would have been surrendered, in good faith and in the exercise of due care and diligence, before any active steps were in fact taken by plaintiffs to enforce their beneficial rights therein,—it is *held* that the treasurer's act, though a technical breach of his legal duty, did not cause any actual damage to plaintiffs, and hence that nominal damages only are recoverable.

WINSLOW, C. J., dissents.

APPEALS from a judgment of the circuit court for Fond du Lac county: CHESTER A. FOWLER, Circuit Judge. *Reversed.*

The action is brought by plaintiffs against *Andrew H. Dahl* and the *National Surety Company* for an alleged breach of the bond of *Dahl* as state treasurer. It is alleged that the treasurer breached his bond by unlawfully surrendering securities deposited with him as state treasurer by the Wisconsin Savings Loan & Trust Company of Hudson, Wisconsin. The *National Surety Company* is the surety on the bond.

This case was before this court on appeal from an order sustaining a demurrer to the complaint. The statement of facts and pleadings contained in the report of the case on that appeal (150 Wis. 73, 135 N. W. 474) need not be repeated here. After the case was remanded to the circuit court for Dane county, that court determined that the action was one at law and that defendants were entitled to a jury trial. Thereafter upon application of plaintiffs the case was transferred to the circuit court for Fond du Lac county and a trial had in that court. The question whether the case

was one at law or in equity was raised in that court and Judge Fowler ordered that the case proceed to trial before a jury, withholding final determination of this question. The case was tried to a jury and a special verdict was rendered. The court thereafter held that the action is one in equity and treated the verdict as advisory only. The court made its findings of fact and conclusions of law.

The jury found by answers to special questions as follows:

"(1) Would the defendant *Dahl* have exercised ordinary care as state treasurer had he held the $45,000 of securities until the resolution of dissolution was recorded in the office of the register of deeds of St. Croix county, and then turned them over to the trust company? *A.* Yes."

"(4) Did the defendant *Dahl* exercise ordinary care as state treasurer in turning over the remaining $5,000 securities on April 17, 1909? *A.* Yes.

"(5) Did the Wisconsin Blue Grass Land Company have sufficient profits on June 16, 1905, out of which to pay the bond dividend? *A.* No."

Among other findings the court made the following:

"2. That the Wisconsin Savings Loan & Trust Company was a corporation as in the complaint alleged with its principal office and place of business at Hudson, Wisconsin. That on March 10, 1908, the stockholders of said corporation, at a special meeting duly called for the purpose of considering dissolution, unanimously and duly passed a resolution declaring that the said 'Wisconsin Savings Loan & Trust Company be and the same hereby is dissolved and its business discontinued from and after the passage of this resolution.'

"3. That a certified copy of said resolution was filed in the office of the secretary of state of the state of Wisconsin on March 1, 1909; that a like copy was filed in the office of the register of deeds of St. Croix county, wherein Hudson is located, on March 2, 1909, at 8:30 o'clock a. m., and that the same was recorded in said office some time during the day of filing."

"4. That the defendant *A*. *H*. *Dahl* was at all the said times treasurer of the state of Wisconsin and as such held in his possession certain securities belonging to the said trust company for the purposes and under the trust designated and prescribed by sec. 1791*e,* Wis. Stats. 1898, as it then stood in force.    That on March 1, 1909, said *Dahl* turned over to the representatives of the said trust company securities then in his possession as aforesaid of the value of $37,221.79, and that on April 17, 1909, he turned over to representatives of said corporation the remaining securities held by him as aforesaid of the value of $5,000.

"5. That the turning over of said securities as aforesaid was induced and procured in reliance upon the truth of a statement in the form of an affidavit signed and purporting to be sworn to before a notary by one N. B. Bailey, the then president of said company, and who had theretofore been active in the management and was familiar with the affairs of said corporation.    That said statement recited, among other things, that the debts of the said corporation were wholly paid and that it had no outstanding obligations.    That the said *Dahl* believed the said representations and acted thereon in entire good faith in the surrender of the said securities.

"6. That in turning over the said first lot of securities the defendant *Dahl* did not act with due diligence and ordinary care, and that under the circumstances then present he would not have exercised due diligence and ordinary care had he turned them over when the said resolution of dissolution was recorded in the office of the register of deeds at Hudson, and that the turning over of the said securities proximately caused injury to such of the relators as were at the time creditors of the said trust company within the meaning of sec. 1791*e,* Wis. Stats. 1898.

"7. That in turning over said second lot of securities the defendant *Dahl* exercised due diligence and ordinary care.

"8. That at the time the defendant *Dahl* turned over said securities there were outstanding and not yet due a large number of bonds theretofore issued by the Wisconsin Blue Grass Land Company, a Wisconsin corporation.    That the said trust company prior to the issue of said bonds had entered into an agreement with said other corporation, in man-

ner and form as set out in the complaint, whereby it had undertaken to act as trustee for the holders of said bonds. That by said contract securities were to be turned over to the trust company by the said Wisconsin Blue Grass Land Company to the amount of twenty per cent. in excess of all bonds issued, the trust company was to hold such securities in its possession and collect the principal and interest thereof and pay therewith the principal and interest on bonds issued to the holders thereof as the same fell due, and was to countersign said bonds and certify thereon that each issued was one of the series for payment of which it held securities as aforesaid, and that no bonds were to be valid until so countersigned.    That said bonds all bear date as of July 1, 1905, bear interest at the rate of six per cent. payable semi-annually, are negotiable in form, and fall due by their terms on July 1st at different years between July 1, 1909, and July 1, 1914." . . .

"10. That subsequent to the issue of said bonds the said Wisconsin Blue Grass Land Company assigned all its assets to another corporation, the Northern Blue Grass Land Company by name, which assumed all its debts and obligations, and was at the time of the dissolution of said trust company liable for the payment of said bonds.    That said Wisconsin Blue Grass Land Company at the said time of dissolution had no assets whatever.    That at the time of dissolution of said trust company as aforesaid the said Northern Blue Grass Land Company was insolvent.    That thereafter in proceedings for winding up its affairs in the federal court of the Western district of Wisconsin, a receiver was appointed, and assets were collected and administered sufficient to pay to its creditors a dividend of two per cent. and not in excess thereof, not making any deductions for attorney fees or expenses of administration." . . .

"13. That prior to the actual dissolution of said trust company its directors had voted to borrow from the Union Investment Company, a corporation, the sum of $35,000 to raise money with which to pay its debts other than obligations in connection with said bonds, and to pledge certain securities it then had in its own possession, of the value of $10,917.19, and also all securities in the hands of the state

treasurer, to secure the payment of said loan. That this resolution was passed November 13, 1908, and among the directors voting therefor were the relators Bailey, Bell, and F. E. Settergren, for whom the relator *Battles* is trustee in bankruptcy. That the said resolution contemplated the procuring of all securities from the state treasurer and turning them over to the said Wisconsin Mortgage Loan & Investment Company. That the following relators and claimants herein as bondholders were stockholders of the said trust company at the time of the passage of the said resolution of March, 1908, and voted therefor in person or by proxy, viz. *E. A. Rademacher, J. K. Hannay,* George W. Bell, William Paulton, and A. H. Barber. There also voted for said resolution the following stockholders, viz. F. E. Settergren, represented by relator *E. J. Battles,* his trustee in bankruptcy, G. W. Pittman, also represented herein by said *Battles* as his trustee in bankruptcy, and N. B. Bailey, who is represented herein by the relator, his trustee in bankruptcy, E. B. Kinney."

By finding 14 the court finds that shortly after such resolution numerous claimants and plaintiffs signed an instrument as follows:

"The undersigned holders of bonds issued by the Wisconsin Blue Grass Land Company, the collateral securing which being held by the Wisconsin Savings Loan & Trust Company of Hudson, Wisconsin, owing to the fact that the Wisconsin Savings Loan & Trust Company is to retire from business, hereby agree and consent that the securities securing these bonds be held by the Wisconsin Mortgage Loan & Investment Company, a corporation which is being formed to succeed the trust company, it being understood that the Wisconsin Mortgage Loan & Investment Company will carry out the same contract entered into by the trust company."

"15. That the said Wisconsin Mortgage Loan & Investment Company was organized for the transaction of business, and that sufficient stock, paid for by surrender of certificates in the said trust company, was issued to enable it to commence business. But the said corporation has no assets, and is unable to pay any sum to its creditors."

By findings 16 and 17 the court finds in effect that a portion of the bonds issued by the Blue Grass Land Company and held by plaintiffs were so issued as dividend bonds pursuant to resolutions of such company and to be deposited with the Savings Loan & Trust Company as trustee, but that the company in fact had no dividend to distribute. The court finds by findings 18 to 46 inclusive the ownership of the bonds by various plaintiffs and the amounts due thereon.

"47. That the defendants executed the bond set forth in the complaint, and that in surrendering said first lot of securities by said *Dahl* as above found the said *Dahl* failed to 'faithfully discharge the duties of his office' as state treasurer, and failed to 'deliver' to the persons 'authorized by law to receive the same all papers and other articles and effects belonging to said office.'"

The court, as conclusions of law, among other things held:

"1. That the Wisconsin Savings Loan & Trust Company became liable to the holders of said bonds under its said contract, by reason of its said breach thereof, for all damages sustained by reason of its said breach, and that the holders of such said bonds as were valid in their hands who have not by their acts waived or become estopped from asserting their rights were creditors of the said trust company at the time of the surrender of said bonds by the defendant *Dahl* as aforesaid."

"5. That all bondholders who were stockholders in the said trust company at the time of the passage of the stockholders' resolution of dissolution, by their act in voting for dissolution as aforesaid and by failing to notify the defendant *Dahl,* prior to his surrender of the securities held by him, of claims against him waived all rights they otherwise might have had as creditors against the defendant *Dahl* as trustee.

"6. That such relators as are *bona fide* holders of bonds for value before maturity in due course are creditors of the said trust company within the meaning of sec. 1791e, Wis. Stats. 1898, and such thereof as have not waived or estopped themselves from asserting right thereto are entitled to recover herein against the defendants."

"8. That the measure of damages to the relators who are entitled to recover herein is the difference between the amount they would have received had the defendant *Dahl* retained said securities in his possession as trustee under said statute and the amount they will receive from the trustee in bankruptcy of said Northern Blue Grass Land Company and the receiver of said trust company."

"11. That the surrender of said securities by said *Dahl* as found was a breach of his bond given by himself and the defendant surety company, and the defendant surety company is liable upon said bond to the same extent and amount as the defendant *Dahl* is liable by reason of his surrender of said securities."

The court awarded judgment pursuant to such findings and conclusions of law in favor of *H. T. Sheldon* as receiver, for the benefit of the plaintiffs the court found entitled to recover. This is an appeal from such judgment.

For the plaintiffs there were briefs by *Richmond, Jackman & Swansen* of Madison, attorneys, and *Sanborn & Blake* of Madison and *Young & Stone* of St. Paul, Minnesota, of counsel; and the cause was argued orally by *John B. Sanborn.*

For the defendants there were briefs by *Jones & Schubring* of Madison, attorneys for *Andrew H. Dahl,* and *Miller, Mack & Fairchild* of Milwaukee, attorneys for *National Surety Company;* and the cause was argued orally by *Burr W. Jones* and *E. J. B. Schubring,* and by *James B. Blake* of Milwaukee.

SIEBECKER, J. The judgment is assailed by the defendants upon the grounds that the trial court erred in holding (1) that this is an action in equity and that the verdict of the jury can be treated only as advisory; (2) that the defendant *Dahl* would have been guilty of a want of ordinary care had he turned over the first $45,000 lot of securities when the resolution of dissolution of the trust company was

recorded in the register of deeds' office as required by law; and (3) that the surrender of the first lot of securities by the state treasurer, under the facts and circumstances shown, constitutes an injury to plaintiffs which naturally and proximately caused actual damage to the plaintiffs who were at the time creditors of the trust company, within the meaning of sec. 1791e, Stats. 1898.

Counsel have made an exhaustive presentation of the questions litigated and their briefs have afforded the court valuable assistance in the study and consideration of the case. In the view we take of the case it will be necessary to discuss but one question, namely, Did the surrender of the securities by the defendant *Dahl* as state treasurer, under the facts and circumstances established by the evidence in the case, naturally and proximately cause the plaintiffs any actual damage? In the determination of this question it will be well to refer to the decision on the former appeal of the case to this court (150 Wis. 73, 135 N. W. 474), in order to have before us the law of the case as established in that decision. It was there held that the official duties imposed on the state treasurer under sec. 1791e, Stats. (ch. 504, Laws 1905), to hold securities or cash deposited by a trust company for the benefit of such parties as the statute specifies, is a duty guaranteed by the treasurer's official bond. As to the nature of that duty the court declared:

"There can be no mistake about the scope of that duty, no room for the exercise of judgment or discretion. The securities are required to remain in the possession of the treasurer for the trust purposes named 'at all times during the existence of the corporation.' Sec. 1791e, Stats. Now if the statute fixes a definite time at which the corporation ceases to exist, there can be no question of doubt under the statute as to the duty of the treasurer previous to that time."

The court proceeded and stated that when a corporation like a trust company proceeds voluntarily to dissolve it ceases to exist for the purposes of the provisions of sec. 1791e,

Stats., when certified copies of the resolution of dissolution have been filed and recorded as required by sec. 1789, Stats. The effect of the decision respecting the duties of the trust company is stated as follows:

". . . after that time the treasurer remains in possession of the securities still charged with the duties of a trustee, but relieved from the absolute mandate to retain possession. During this time if any court having jurisdiction of the subject matter and of the parties directs that the moneys be delivered over to an officer of the court, or to a third party, the treasurer will, of course, be protected in obeying such order; probably he would be protected also in releasing the funds without the order of a court if he act in good faith and exercise reasonable care and diligence."

Whether or not a surrender in good faith without reasonable care rendered defendant liable was left an open question. The facts of the case are now before us to determine whether or not the state treasurer, *Mr. Dahl,* did exercise reasonable care and act in good faith in surrendering the securities in the manner and at the times he did. The court and jury found that the treasurer's actions in this regard were in the best of faith and the facts abundantly sustain this conclusion. The court and jury also found that the treasurer exercised reasonable care and diligence in the surrender of the $5,000 lot of securities on April 17, 1909, and this finding is also well sustained by the evidence. The court and jury are not agreed on the question of the treasurer's exercise of ordinary care had he held the securities until the dissolution resolution was filed on March 2d in the office of the register of deeds and then surrendered in the manner he did on the 1st of March. The jury found that the surrender of them on the 2d of March, under the facts shown, would have been an act in the exercise of reasonable care, but the court found that under the facts and circumstances shown such a surrender would have been a want of such care. The jury's finding, however, does not exempt *Mr. Dahl* from lia-

bility for surrender of the securities on March 1st, the day before the dissolution resolution was in fact recorded, because the surrender of them on March 1st, as above shown, constituted a legal breach of his bond and rendered him liable to creditors, if such premature delivery naturally and proximately caused the plaintiffs any actual damage. The fact that the corporation was legally dissolved on March 2d, except for winding up its affairs, is established. This authorized the treasurer to surrender the securities at that time or thereafter, under proper circumstances, either to the owner or to creditors of the owner showing a right thereto within the contemplation of the provisions of sec. 1791e, Stats. The facts are undisputed that none of the plaintiffs took any active steps to enforce their rights or obtain legal custody or secure possession of the securities for the benefit of creditors for months after March 1, 1909. It is uncontroverted that the treasurer did, upon the demand of the Savings Loan & Trust Company, depositor and the owner of the securities, and the Union Investment Company, as assignee thereof, surrender them to the trust company and that they were immediately turned over to the Union Investment Company under the assignment of the trust company to the investment company made November, 1908, and that the proceeds thereof were applied in payment of a $35,000 debt then owing by the trust company to the investment company.

The facts and circumstances of the case show conclusively that the action of the state treasurer on March 1st did not cause the plaintiffs to change their course of conduct or have any connection with plaintiffs' failure to take immediate steps to have the securities applied in satisfaction of their claims against the trust company, and that the release of them by the treasurer on the day before the trust company was lawfully dissolved did not in fact prevent or prejudice the plaintiffs from taking any contemplated action on their part to assert their legal rights to have the securities applied in

satisfaction of their demands against the trust company. *Dahl* has not wrongfully appropriated the securities or the proceeds thereof to his own individual use, and he has none ·of their avails in his possession either personally or as state treasurer. The failure of the trust company to meet its obligations as trustee of the Blue Grass Land Company, caused by the dissipation of the trust company's property and securities, is wholly independent of the alleged breach of duty of the state treasurer and is solely attributable to the misconduct of the officers and agents of the trust company, and the treasurer is in no way implicated with them in their wrongdoing. The claim made against the treasurer for damages resulting from the breach of his official duty in ·prematurely delivering the securities is in no way connected with any legal liability for such misconduct of the corporation officials. In fact the injuries caused the plaintiffs by such official misconduct were occasioned a long time prior to March 1st.

The question presented by the record is this: Did the treasurer's act of surrendering the securities as he did on March 1st, under the facts and circumstances of the case, naturally and proximately cause the plaintiffs any actual damage? Of course the treasurer's technical breach of duty in making delivery of the securities on March 1st does not of itself prove that plaintiffs suffered actual damage therefrom, nor does it vest plaintiffs with an absolute right to recover the value of the securities as the measure of their damages. The gravamen of the cause of action stated· in the complaint is that the alleged breach of the treasurer's legal duty on March 1st caused plaintiffs the loss of the securities and thus caused them the actual damage of losing payment of their bonds. The relief demanded is clearly and plainly compensation for damage alleged to have been naturally and proximately caused by this breach of legal duty. The ordinary rules of proof of damages to compensate for injuries recognized in the law are applicable in this case. It is ele-

mentary that damages must be certain in their nature and that they are to a reasonable certainty the natural and proximate result of a known cause. Applying these rules to the facts before us, we have an established and certain breach of a legal duty by the treasurer in that he surrendered the securities on March 1st, contrary to law. It also appears that on March 2d, or any time thereafter, he had the legal right to surrender the securities to the parties to whom he delivered them on the 1st of March, if the delivery was made in good faith and in the exercise of reasonable care. The evidence shows that the mere surrender of them on March 1st was no more than a technical breach of duty. It also appears that the plaintiffs were not thereby induced to forego any immediate active steps to enforce a claim to these securities, nor is there any evidence tending to show that plaintiffs' relations to these securities would have been different in any particular than they actually are and have been, if such transfer had taken place on March 2d instead of March 1st. We have made exhaustive search to find any evidence tending to show that different consequences did immediately flow out of the surrender of the securities on March 1st than possibly could have resulted from a surrender of them on March 2d, or at any time up to April 17th when the last $5,000 lot was surrendered, and we find the record barren of evidence tending to show that the consequences would have been different from what they actually are. It is therefore self-evident that the surrender of the securities on March 1st in fact caused no more actual injury or damage than a surrender of them on the 2d of March or at any time up to April 17th would have caused. It necessarily follows from these facts that the plaintiffs' beneficial interest in the securities was not affected by the bare fact of the premature surrender of the securities on March 1st instead of March 2d, or at any time thereafter before the plaintiffs took active steps to enforce their beneficial interest in them. As held by the circuit court on this point: "They are as well off in every re-

spect as they would have been had the surrender been made at the later time instead of when it was." We are also fully satisfied that the treasurer properly surrendered the $5,000 lot of securities on April 17th. As above stated, the evidence amply sustains the court and jury in finding that he acted in good faith and with due care in making this surrender. We are persuaded from all the facts and circumstances disclosed by the evidence that *Dahl* would have surrendered all the securities not later than April 17, 1909. The trial court entertained the view that if *Mr. Dahl* had waited another day before surrendering any securities, *it is conceivable that he might not have surrendered them at all to the trust company,* and even though it is shown that he would have turned them over when he learned that the dissolution resolution had been properly filed, "we cannot say that he certainly" would have done so. We are convinced that the record clearly negatives this conclusion. It appears that *Mr. Dahl* learned of some claims against the securities and that he had conferences, interviews, and correspondence in the matter, yet nothing came to his knowledge that suggests he would have taken a course different from what he did. Nor is there any fact or circumstance tending to show that the actual state of affairs of the trust company and the unfortunate conditions of its creditors would properly have come to his knowledge. To say he might have learned things which would have caused him to hold the securities and that these plaintiffs would have received a benefit therefrom, is a mere speculation and conjecture. All the evidence clearly preponderates to refute such claims and tends to show that he would have surrendered the securities on or before April 17th, and that such a surrender would have been, as the one on April 17th actually was, in good faith and in the exercise of due care and diligence. The inference from these ultimate facts in the case leads to the irresistible conclusion that plaintiffs suffered no actual damage immediately flowing out of the breach of duty of the treasurer on March 1st. Though this technical breach

of duty is in law presumed to be an injury causing some damage, the evidence fails to show with any reasonable certainty that it naturally and proximately caused the plaintiffs any actual damage. This injury can be said to have resulted in no more than the legally presumed nominal damage.

The principle ruling the question of damages for official breach of duty applicable when a sheriff fails to produce the body of a debtor, as required by law, or his failure to attach and seize property under command of the law to satisfy the claim of a judgment creditor, is an exception to the general rule measuring the liability of officers for breach of official duty, and is not applicable here. 1 Sutherland, Damages, § 160. In the case of *Dow v. Humbert,* 91 U. S. 294, the strict rule of damages in such cases was held to have been modified, the court declaring:

"It is not easy to see on what principle of justice the plaintiff can recover from defendants more than he has been injured by their misconduct. If it were an action of *trespass,* there is much authority for saying that plaintiff would be limited to actual and compensatory damages, unless the act were accompanied with malice or other aggravating circumstances. How much more reasonable, that for a failure to perform an act of official duty, through mistake of what that duty is, that plaintiff should be limited in his recovery to his actual loss, injury, or damage!"

The court held in substance that in the absence of proof showing that actual damages were naturally and proximately caused by an omission of official duty, only nominal damages are recoverable where a liability exists. This rule underlies the decisions in *State v. Bœtz,* 44 Wis. 624; *State v. Ruth,* 14 S. Dak. 92, 84 N. W. 394; and *Branch v. Davis,* 29 Fed. 888.

It is considered that upon the record it is shown that the defendant *Dahl* acted in good faith in surrendering the securities on both March 1st and April 17th, and that though *Dahl* technically breached his duty in surrendering part of

such securities on March 1st, one day before he could legally
do so, such breach of duty did not naturally and proximately
cause plaintiffs any actual damage, and hence no more than
nominal damages can be awarded.    This result renders it
unnecessary to consider any of the other questions presented
to the court on this appeal.

*By the Court.*—The judgment appealed from is reversed,
and the cause remanded to the circuit court with direction to
enter judgment awarding the plaintiffs nominal damages and
awarding the defendants judgment for costs.


Vinje, J., took no part.


Winslow, C. J. (*dissenting*).    I have been unable to
agree with the conclusions of the court in this case and I wish
to state very briefly my reasons.    The purpose of sec. 1791e,
Stats., is to make it certain that the creditors of a trust com-
pany shall have a substantial amount of collateral security in
the hands of the state treasurer at all times during the exist-
ence of the company, to which they may resort for payment
of their claims in case the trust company fails to pay them.
The duty to keep the securities intact up to the very moment
when the trust company ceases to exist is absolute.    *State
ex rel. Sheldon v. Dahl,* 150 Wis. 73, 135 N. W. 474.    It is
established here that the securities were surrendered during
the life of the trust company, that they are no longer within
the reach of the creditors, that the relators, or at least a part
of them, are creditors of the trust company for whose benefit
the deposit existed, that they have exhausted their remedy
against the trust company, and that they are still unpaid.
That these facts make a *prima facie* case of breach of the
treasurer's official bond resulting in injury to the relators
cannot be doubted.    This is only met by the argument that
the evidence conclusively shows that no damage resulted to
the relators by reason of the surrender of the securities just

before the legal decease of the company, because they would have been surrendered with exactly the same result a day or two later, just after the legal decease of the company, when their surrender would have been authorized and legal. In my opinion this is pure speculation. What in fact happened, after March 1st furnishes no persuasive proof of what would have happened had there been no delivery of the securities on that day. To my mind it seems extremely probable that the treasurer would not have delivered them at all had he waited until March 2d. At that time both the trust company and the Northern Blue Grass Land Company were financially embarrassed and practically bankrupt. The Wisconsin Blue Grass Land Company turned over all its assets to the Northern Blue Grass Land Company in March, 1908, the latter corporation assuming to pay all liabilities of the former. As a matter of fact, the personnel of the two companies was the same. There had been a period of "high finance" at Hudson and the harvest of bankruptcy and ruin was being reaped. The officers of the trust company and the two land companies were the same, and they juggled securities back and forth whenever necessity required. On March 1, 1909, there were no securities left in the hands of the trust company to protect the bond issue of the Wisconsin Blue Grass Land Company. The trust company had on November 13, 1908, borrowed $35,000 from the Union Investment Company of St. Paul for the purpose of paying up its indebtedness, which at that time was about $50,000, besides $55,000 face value of the bonds of the Wisconsin Blue Grass Land Company outstanding. The Union Investment Company knew nothing of these last named bonds nor of the agreement of the trust company to hold securities for their protection, and hence knew nothing of the claims which might be made against the trust company for breach of its contract with reference to those bonds. When the negotiations were on between Mr. Haven, acting for the trust company, Mr. Nye, acting for the Union

Investment Company, and *Mr. Dahl,* for the surrender of the securities in question, nothing was said about any possible liability on the Blue Grass Company bonds.   The situation was delicate; there might be an explosion at any time if this additional liability was discovered.   *Dahl* was finally persuaded to turn over $45,000 face value of the securities, retaining $5,000 as a measure of safety.   At that time he had received no claim from any one.   An inquiry had been made by one Ring on February 26th, but no claim made.   On the morning of March 2d *Dahl* received a letter from Ring stating that he had a claim against the trust company *as trustee* and asking that the securities be retained until it was satisfied.   On March 4th *Mr. Dahl* received a like letter and demand from one Greer.   He at once wrote letters to the trust company and to Haven expressing surprise, demanding an explanation, and stating that he would hold the remaining $5,000 of securities for a time.   There was at once activity on the part of Bailey; Ring was paid by check, and the Greer claim was bought by the Northern Blue Grass Land Company by giving a mortgage on some of its lands.   Bailey and Haven wrote letters on March 5th and 6th respectively explaining that the claims had been settled.   In these letters *Mr. Dahl* first learned of the bond issue, but was assured that the claims were not valid.   On April 14th Mr. Haven sent to *Mr. Dahl* written statements signed by Greer and Ring that they had no claims against the trust company, and on April 17th following *Mr. Dahl* surrendered the remaining $5,000 of securities to Mr. Haven.   My proposition is that no one can say what would have happened had *Mr. Dahl* held the securities until March 2d instead of surrendering them on March 1st.   At that time he would have been in possession of the letters from Greer and Ring making definite claims on the fund.   It is most improbable that he would have ignored these claims; his letters of surprise to Bailey and Haven are proof enough of this.   He would doubtless have

retained the entire $50,000 of securities.    What effect would this have had on the attitude of the Union Investment Company, which was financing the trust company's retirement and knew nothing of the liability resulting from the bond issue? The investment company advanced $10,700 of new money to the trust company on March 19th.    Would Bailey have been able to raise the money to buy up the Ring and Greer claims if the true situation had become known, the securities retained by *Dahl,* and the investment company thereby delayed in obtaining the securities for which it was clamoring?    Is it not extremely probable that there would have been an explosion had the investment company been unable to obtain the securities, especially when it learned for the first time of the bond issue?    Would not the treasurer have ascertained the utter falsity of the affidavit of Bailey to the effect that the trust company owed no debts or obligations of any kind when in fact it owed many thousands of dollars to the investment company and was contemplating a further loan?    Would not the treasurer have demanded a complete investigation of the whole situation before releasing the securities if these facts had been before him?

The events of life are complicated and interdependent.    A comparatively insignificant circumstance may lead on to the most momentous consequences.    No man is wise enough to say what would have been the result had the apparently insignificant circumstance never happened.    That must always remain pure conjecture.    So I say in the present case that no one can say with any certainty what would have happened had the treasurer performed his duty as the statute lays it down, and hence I think the *prima facie* case of damage resulting from the treasurer's breach of duty is not met.    It seems to me that a law expressly framed to protect the creditors against the dishonesty or business inefficiency of officers of trust companies has not been enforced in this case, and I regret the result.